argument not to exceed 15 minutes per side. Council, when you're ready, you may proceed for the appellate. Perhaps you could begin by telling us what caused you to be absent from the courtroom when the case was called. I'd seen, Your Honor, I was the third case on the docket, and I was out in the attorney conference room with the intent to come back. Well, that's entirely understandable. I don't guess anybody, we managed to tell you that the attorney didn't show up in the first case, too. And so we got way ahead, we were ahead of ourselves. A lawyer doesn't show up when the case, is not there when the case is called, needs to throw himself on a sword, so please accept my apologies, Your Honors. I apologize for the inconvenience. This is a good, interesting case. Christopher Goins comes before the court, arguing that the Second Amendment, particularly based on the Supreme Court's decision last June in Bruin, prohibits his prosecution for violation of 1922 G1, which we commonly refer to as the felon in possession statute. The facts are important here. Goins went in with a friend on December 5 of 2021 and had his buddy make a straw man purchase of a firearm at a pawn shop. Became kind of suspicious of what they'd seen. They contacted the ATF, who in turn, an agent got in touch with the straw man, asked him what had gone on. The straw man gave him Goins' phone number, the ATF agent got in touch with Goins, told him to return. He wasn't supposed to have the gun, and he wanted it back. They met, I think the following day or the day after, in a parking lot of a sportsman's warehouse in Lexington, and the gun was returned to the ATF agent. He had it for about six days. Eight months later, he got prosecuted. So it's not a case where he was stopped driving drunk and had a gun, or it's in connection with some other criminal activity. I want to ask you, was Mr. Goins on probation at the time that this occurred? He was on the state court case in Fayette Circuit, and that's the prior convictions that are punishable by more than one year. It's a DUI, fourth, and a low-grade criminal drug possession. The reason I ask is I was looking at the final judgment sentence of probation, and one of the conditions of probation is no firearms or weapons of any type other than an ordinary pocket knife. So I'm wondering, what is your position as to that condition of probation? Apparently he was under at the time that he was found with the gun. Are you challenging this as also violating the Second Amendment? No, Your Honor. I'm not here to ask the court to consider the state court judgment. So you acknowledge that this was a valid condition of probation that he was under at the time that he was found with the gun? Yes, yes. So why shouldn't we, in doing the history and tradition analysis, actually be looking at what the effect or the history and tradition is of persons who are under probation that say that the condition says they're not supposed to have a gun? Why don't we look at that as also part of the relevant facts for history and tradition? Because I don't think you've really addressed that in any of your briefings. It's not been addressed in any of the briefings by either of the parties, nor was it addressed by the district court, nor was it addressed – there was actually supplemental briefing in the district court and never addressed there. But couldn't you look at probation as being something that really takes this case out of all these other cases we're looking at, at least that have looked at the history and tradition so far? Well, but he's charged with a violation based on the fact of – I guess I'm wondering, how can you have a Second Amendment claim if there's already an independent basis under state law that he shouldn't have a gun? Wouldn't that be for the state court to decide whether or not he violated probation and it should be revoked rather than – I was going to ask that. Did the state court find a ruling on the probation? No, they did not. He served 120 days and was required as an additional condition to attend an alcohol and substance abuse rehab program, which he completed very successfully. And I noted in the brief Judge Van Tatenov's remarks about what truly was an extraordinary instance of rehabilitation. Mr. Goins personally does represent a redemptive case. But Judge Bush, you're the first one to make that argument or raise that point. I would say I guess the answer to the question is that argument's been waived or forfeited. It never has come up before in the court. Well, what we're trying to do is figure out comparators in history and tradition. It seems like you've got to look at – don't you have to look at all the circumstances of the particular defendant to determine whether there's a historical comparator or not for allowing for the person to have their gun taken away? Yes. The scope – the answer to that question is how broad is the scope of all the particular circumstances, I think. We've been given a framework from Bruin to look at historical evidence, and it's really not a question. There was no felon in possession laws until the 20th century. I think some states, Massachusetts and New York, were the first states to adopt them, maybe the first couple of decades. You haven't looked at the history of probation, I take it. No, it's not been examined in the brief. I don't understand your position to have a limiting principle at all. I take it you think we have to look at the closest level of generality, and that's your reading of Bruin. And since there were no felon in possession laws at the time of the founding, that means if a government makes the decision to release somebody back into society, no matter what crime they committed, they have a right to possess a gun. So would your argument apply the same way if he had been convicted of murder rather than DUI and was released? I don't think the rule is that broad, I think, is the proper term. The court in Bruin distinguished but two paths, a distinctly similar and a relevantly similar path, depending upon whether the problem being addressed was considered old or new. A new problem would be something, a technology not present in the late 18th century, a social problem unconsidered or maybe not present in the 18th century. Certainly drunkards were present in the 18th century. They were murderers, though. They were, they were. And I would have a lot tougher case if I was here. But I think that is your case. Because I think you are interpreting Bruin to say the level of generality is you have to have an analogous law. And because there were no analogous felon in possession laws at the time of the founding, if you are a felon who has been released back into society, you have a right to have a gun. And it doesn't matter what type of crime you committed. I don't think you have to decide that in this case. I think you just have to decide is this individual, going back to your point, Judge Bush, is this individual, having been convicted, who has an ample, and I'm not going to dispute it anyway, I can't, an ample record of being really an alcoholic and a low-level drug user as well. Is there a historical tradition of firearm regulation present in the late 18th century that would indicate he would have been disarmed at that time? So my case is narrower. So what is your legal, how would you distinguish, what legal rule are you asking us to adopt that would distinguish the murderer from your defendant, somebody who commits repetitive DUIs? So that's what I was having trouble understanding in your brief. I got you from your brief that these laws came into existence in the 1900s. What I didn't get is what the conclusion we should draw from that. The biggest distinction is we have nonviolent felonies here, as opposed to homicide and other violent felonies. The law we worked under when it was started, or enacted in 1938, addressed homicide and other crimes that we consider as violent crimes, and in the years since has been expanded, I think in the 1960s and early in the part of this century as well, to reach out to crimes of this nature. So that's the distinction. So you're now advocating, I take it, for something like Justice Barrett's dissent, which is a dangerousness test. Is that fair? Dangerousness paints with a little bit too broad a brush. The Supreme Court directed, not the Supreme Court, but the Fifth Circuit in the Daniels case talked about examining how and why the individuals were disarmed. Justice Barrett talks about at the founding you had people who were perceived loyalists, people, Catholics at that time, were very disfavored because they were considered at least potential insurrectionists. Drunkards, however, were not deemed at the time in the same category. Not saying they weren't considered dangerous, but they weren't considered dangerous to the same degree because there was no official action taken. There was no laws passed disarming drunkards at the time as opposed to Catholics. Well, a query to Mr. Goins as a drunkard might be good advocacy, but he was a little bit more than that. I mean, he possessed controlled substances, right? He was a low-level drug user in addition to being an alcoholic, Your Honor. And he caused danger to others through operating vehicles while under the influence, right? That's true. Isn't it reasonable to conclude if he's dangerous with a car, he will be dangerous with a gun? I mean, Judge Murphy's point seems to me correct. I mean, having the car in the possession of the person under the influence is one thing. Having the gun is yet another. If we were here and he would say he had a prior felony for drug possession, he'd been pulled over for DUI regardless of whether it was a first or fourth offense, and he had a gun, it's a different case because now you have someone who's intoxicated who's out in public with a firearm he's not supposed to have. Mr. Goins, on the other hand, was not in that situation. He possessed a firearm in his home for, I guess, about six days. The only thing about that, that was fortuitous. I mean, had it not become known that he had the gun and he wasn't supposed to have the gun, he probably wouldn't have wandered over to turn it into the ATF of his own volition. I mean, it came about as a result of the surveillance and the knowledge that he had the weapon. That's correct. That's correct. It wasn't his own good heart. He didn't volunteer and show up and turn it in and admit, I've changed my mind, shouldn't have had this, and anyway, I'm giving it back in. I have to concede that point on the record. I relied heavily on the Fifth Circuit's analysis in the Daniels case comparing drunkards and drug users to loyalists to Catholics that were considered dissenters and potential insurrectionists. But the big difference between this case and Daniels, or a couple of big differences, is the convictions. And the fact that he's on probation. Which has a condition that says he's not supposed to have a gun. Those are big differences between this case and Daniels. Certainly the probation factor, which has again, I say no one else has brought up, and I have to argue that that's been waived by the government here, Your Honor. The nature of the prior convictions doesn't make a difference. I mean, they are different. Thank you. Good morning. May it please the Court. Mahogany Reef of the United States. Judge Bush, I want to start with a point that you made about the condition of probation that Mr. Goins was under at the time he purchased the firearm. My understanding is that some courts have considered that as suggesting that a defendant doesn't then have standing to challenge Section 922G1 under the Second Amendment. That's not necessarily the government's position. But it is certainly a relevant consideration when assessing the question whether Section 922G1 is constitutional as applied. I want to make the threshold point that it's the government's position, it's our position, that Section 922G1 is constitutional in all its applications. And we think you can reach that by- That obviously would be a more favorable ruling. Oh, I would love that, Judge Giddens. And as we suggest in our brief, we think you could get there by determining that Bruin didn't abrogate this court's case and carry. Can I ask you a preliminary question? Do you think- I know that the Supreme Court has a pending case right now that was argued a couple months ago called Rahimi. That's right. Do you think that that case would provide significant guidance at all in this context? I know it arises in a little different context. But having listened to the oral argument, I mean, one of Justice Kagan's questions was to the Solicitor General, was what type of guidance do you think we could provide here? And the Solicitor General gave a couple of answers. I'm curious, do you think that case would impact our analysis here? We certainly don't think it will be dispositive because, as your answer suggests, Rahimi concerns a different subsection to 922G. And we sort of rely on a different theory in the 922G1 context. But I do think that to the extent this court is inclined to apply Bruin's framework in this case, that Rahimi, the decision may elaborate on the proper mode of analysis and methodological approach that courts should take when assessing the constitutionality of firearms regulations under the Second Amendment. I would say, on a first read of Bruin, it does, I mean, all of these issues are always going to come down to what's the level of generality at which you have to find a comparator? And there were some pretty good comparators in Bruin. There was bans on concealed carry. There were bans on carrying in a dangerous manner. And the court said those weren't analogous enough. So here, if the level of generality is as specific as might be suggested by Bruin, I think you have to concede there's no felon in possession statutes until the early 1900s. And that could be problematic if that's the level of generality at which we have to decide this case. I think Bruin makes clear that that's not the level of generality that we should take when assessing the constitutionality of firearms regulations. Bruin was clear that it doesn't require a dead ringer or a historical twin. It merely requires that the government identify a historical analog that's analogous enough. And we think that the historical sources that we've identified in our brief, the capital punishment and forfeiture laws at the founding, laws disarming loyalists, when combined, considered in combination, are sufficient to establish a historical tradition for disarming, at a minimum, persons who have committed crimes that are serious enough to warrant a felony classification, or alternatively, persons whose firearm possession poses a risk of danger to themselves or others. And I think that at that level of generality, which we think Bruin is consistent with, Section 922G1 is wholly constitutional. How do you think it is in the complete control of Congress to affect the Second Amendment by treating something as a felony? So Congress could essentially obliterate the Second Amendment if it adopted a statute that said going 30 miles per hour in a 25 mile per hour zone is a felony, and therefore, if you do that and you get a ticket, you should have no right to own a gun for the rest of your life. We do think that it's up to Congress to decide what conduct is serious enough to warrant that level of punishment. And we defer to Congress's determination in that regard, conscious that there are also consequences for Congress for criminalizing conduct at that level that we wouldn't typically deem serious enough to warrant a felony conviction. But if that's Congress's prerogative or the legislature's prerogative, then yes, we do believe that we would defer to that. It's a categorical rule. Whatever Congress says is a felony, if you get convicted of that crime, you are automatically disenfranchised of any Second Amendment rights. Right. It's the government's position that if you're committed of a felony offense that a legislature has classified a felony offense, then you're removed from among the people to whom the Second Amendment is conferred. Why wouldn't this argument also apply to the Free Speech Clause, the Fourth Amendment, both of which, well, the Free Speech Clause doesn't, the Petition Clause, both of which use the word people. I would think in order for your argument to have consistency, you'd have to be willing to concede that once you're a felon, you lose more than your Second Amendment rights. I have a hard time seeing how people can mean one thing in the Second Amendment and something else in the First or the Fourth. Yeah, well, we derive our understanding of what the people means with respect to each provision in which it appears in the Constitution based on how it's historically understood. And so I don't know that the people, well, Heller did explain that the people refers to members of the political community, to citizens, to Americans. But when thinking about what that term has historically meant in the context of the Second Amendment, I think we point to sources in our briefs suggesting that felons have categorically been excluded from among the political community. Now that may not necessarily be the case when you think about historically how felons' First Amendment rights have been treated or historically how felons' Fourth Amendment rights have been treated. Why isn't your argument the Court has now adopted an originalist approach to the Second Amendment, but it has not adopted an originalist approach to the First and Fourth Amendments? So maybe that would be a way to distinguish them. But I just, it's hard for me to distinguish it if we're at an original matter, that the words would mean different things across the amendments. Right. I understand that. And I would just refer back to the point I just made, that we have to sort of understand the term within the context that it's used and with the history that it brings within that context. I do want to just make one point about Mr. Counsel Opposite's invocation of the Daniels point. To your question, Judge Bush, we do think that Daniels is just wholly irrelevant here because we're not dealing with the question of whether Mr. Gorens should be disarmed based on his alcohol misuse. We're dealing with the question of whether he should be disarmed because he committed conduct serious enough to warrant a felony conviction for a fourth DUI. But again, I'll just reinforce the point that we think that as a categorical matter, Section 922G1 is constitutional no matter the nature of the underlying felony conviction. So the government has the burden to show through history and tradition saying that the regulation has a parallel from the founding era, as I understand Bruin. All I'm seeing out of this history and tradition that's been offered pre-founding is various groups that were disenfranchised or not allowed to have guns. But they were perceived to be in a position to engage in insurrection against the government. I don't see any example really talking about just general protection of the safety of the citizenry as the rationale for the prohibition. I mean, am I missing something? I mean, is there some particular historical example you could point to as closer to what your... the basis for this taking away of the gun here? What's your best historical example? What are you relying upon pre-founding? Pre-founding, I think our best historical example are the felony punishment laws that subjected persons who committed all manner of felony offenses to a capital punishment or a state forfeiture. And I think a potential explanation for why we don't see laws specifically focused on disarming felons shortly after the founding is because, as we've explained elsewhere, the punishment or the consequence of a punishment at the founding or felony at the founding necessarily subsumed the removal of arms. Why don't we also, as part of that formulation, look at what the actual things were that were felonies at the founding as opposed to what are felonies today? Because you take a separate step and say Congress can define the felonies under your test, but there's not really any historical example of allowing Congress to define felonies under what would be considered sufficiently dangerous. Right. Before the founding, I'm thinking specifically about common law felonies. Why don't we just see whether what's now being found as a felony that would allow you to dispossess a person of a gun, whether that is analogous to something that was a felony at the founding, which I think is what Daniels is trying to do, because they're saying there's not any felony regarding drug possession, there's not any felony regarding alcoholism or use of it. That's what I think Daniels was trying to do through his reasoning. Why don't we follow that approach? Primarily because I think there was sort of a proliferation of characterizing conduct as subject to felony punishment post-founding that we wouldn't find a specific analog to at the founding. And so it's necessary to bring in the entire body of how felons at the founding were treated. And as we explained in our brief, and I was attempting to explain just now, they were, at least up until the founding, primarily subjected to capital punishment and estate forfeiture. And this was for both violent felonies and for nonviolent felonies. And so we think that that is kind of the level of generality we have to analogize to, given the state of the historical record. What were the nonviolent felonies for which capital punishment was imposed? These included forging or counterfeiting a public security, altering a will or record. We cited in the range opening merits, I'm sorry, surpetition, additional laws that subjected, for example, the cutting down of a cherry tree to capital punishment. I hope they didn't prosecute George Washington. I'm just glad I wasn't around then. So the nature of the underlying conduct did vary. And the punishment, the consequence was the same. I thought there might be some benefit in this inquiry, and I was trying to figure out what is the most analogous crime to drunk driving today. I know, obviously, cars weren't around, so that's off the table, but we have to analogize back. And I was thinking maybe other dangerous activities. And so I had in my head there were cases about negligently storing firearm or gunpowder and shooting off fireworks or things of that nature. They were considered public nuisances that were criminal. But I guess that, as I understand it, they were only considered misdemeanors. So they might not be subject to this ban. So I'm curious if you think there is an analogous crime that would have been considered a felony and subject to the punishment of death and confiscation of property that is like the felony that is at issue here. I think the improper storage of gunpowder and of firearms was considered an offense that at least warranted forfeiture of the arms and of the gunpowder. And we cite some of those on page 32 of the red brief. I think, you know, I can't think of a specific analog other than laws that disarmed those who had a potential for posing a threat of risk or harm to others if armed, including the loyalist laws we cite in our brief. I think in early America, justices of the peace were authorized to disarm individuals whom they believed posed a risk of harm to others if armed. Isn't there two, so it seems like there's two lines of precedent. And so you've just switched to kind of the dangerous line. And it seems to me that the dangerous can be, your prior crimes can be broader and then you might not have, just somebody who drives drunk a lot might be dangerous. But then there might be this other category that is felony status. And it seems to me like, I don't think it's fair to defend a felony rule with a dangerous response. Maybe you're right that this falls within a rule of, like the legal rule should be people engaged in dangerous activities could be dispossessed of firearms at the time of the felony. But it's not necessarily coextensive with their prior criminal convictions. Right. They are independent. I do think they're reinforcing in some way. And the sort of dangerousness or irresponsibility theory sort of helps to supplement specifically for the lack of very specific historical analogs of the type that you're seeking. I see that I'm out of time. If the court has no further questions, we ask that you affirm the judgment of the district court. Thank you. A few points, Your Honor. I would take issue with the government's argument that the best analogs are the treatment of felons. The reference to a death penalty being imposed and what was called the awkward term civil death. I relied very heavily on Justice Barrett's dissent when she was on the Seventh Circuit. And Judge Vandeknoe agreed that that wasn't, it was really not a good historical record that those practices continued at the founding and in the early years of our country. So I think the conclusion there is that best mixed and really doesn't establish the best analogs. It establishes clearly the tradition of firearm regulation that would make it applicable. You know, English law, I cited a treatise from a fellow named Hawkins, talked about there's a tradition of respecting a man's home as his castle and he may retain arms there. I cited Mr. Churchill's article in the last page of the reply brief, speaking of his own immunity. About possessing firearms in the home for self-defense and that's what this record presents to the court. Mr. Goins was not out in public and found in possession of his weapon. I can tell the court finds this, it is an interesting case and the court's thought about it a lot. I'll rest on the briefs if there are no further questions. I think we're done. Thank you so much. Mr. Bell, we noticed you're appointed under the Criminal Justice Act and I will say the task is undertaking a great deal more in terms of your argument than many attorneys are who are court appointed. You've certainly risen to the occasion. This is probably, if you're a criminal defense lawyer, this is probably a little out of what you do on a day-to-day basis and we're appreciative of your representation. That's very nice of you to say. I'm an amateur historian. It's a really interesting case to try to go through the sources. Well, it's good you've enjoyed it then. Thank you all.